IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARTIN WASHINGTON #3422165 | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. JFM-16-320 |
| W.D. ROUNDS, JR. | * | |
| W.D. ROUNDS, SR. | | |
| S. MURRAY | * | |
| J. DURST | | |
| C. PETERS | * | |
| MALLOW | | |
| Defendants. | * | |
| | ***** | |

## MEMORANDUM

On February 4, 2016, Martin Washington, who is confined at the North Branch Correctional Institution ("NBCI"), filed this 42 U.S.C. § 1983 civil rights action for declaratory and injunctive relief and compensatory and punitive damages against several correctional officers in their individual and official capacities. ECF No. 1. He claims that he was transferred to Maryland from Ohio confinement pursuant to the Interstate Corrections Compact ("ICC").

### Allegations

Washington alleges that on July 27, 2015, he was subject to excessive force when an officer slammed the cell door metal food slot onto his left hand, fracturing it. He also contends that on October 12, 2015, a series of excessive force incidents occurred at the hands of officers. Washington claims that: (1) he was sprayed with a full can of mace inside his cell; (2) on his way to the medical department an officer squeezed his neck and arm "until [he] almost passed out;" (3) after being seen in the medical department he was placed in "the cage" and officers took turns punching him in the lower and upper body; (4) he was again grabbed by the neck and had his neck squeezed by an officer; (5) he was taken to the shower where officers rammed his head

into the back wall; (6) officers punched him in the face and body; and (7) he was again choked by an officer. ECF No. 1. Washington asserts he was left in a cell for several hours without receiving a decontamination shower or medical care. He contends that during the afternoon of that same day he received stitches above his eyes.

Finally, Washington claims that several defendants continue to deny him meals, institutional passes and recreation in response to his filing complaints against them and have, on more than one occasion, promised to kill him. He alleges that he has recently been finding foreign objects in his lunch meals. *Id.*

Correctional Officers Rounds, Sr., Rounds, Jr., Murray, and Durst ("defendants") have filed a motion to dismiss or, in the alternative, for summary judgment, construed as a motion for summary judgment.[1] ECF No. 22. Washington has filed an opposition and defendants have filed a reply. ECF Nos. 24, 25, & 28. For reasons that follow, the court will deny defendants' summary judgment motion.

## Standard of Review

Summary judgment is proper when the moving party demonstrates through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro,* 714 F.3d 828, 833-34 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

---

[1] The Litigation Coordinator for NBCI refused to accept service on defendants Peters and Mallow without explanation. ECF No. 13.

facts. *See Celotex v. Catrett,* 477 U.S. 317 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## Background

Washington alleges that he was subject to excessive force on a number of occasions in July and October of 2015, and sustained injuries to his hand, the mid-section of his body, his head and neck. Defendants provide a different factual background concerning the incidents. They affirm that Washington has a habit of placing his arm in his cell door's slot at "inappropriate times." ECF No. 22-2, 22-3, 22-4 & 22-5.[2] Defendants maintain that one of the reasons that Washington was housed in his particular cell in October of 2015, was because it was more difficult to stick his hands and arms through that cell slot than most cell slots. They contend that it is possible for an inmate to seriously injure an officer by assaulting him through a cell door's slot. *Id.*

### Incident of July 27, 2015

Defendants, referring to a notice of infraction written by Rounds, Jr., state that Correctional Officer Rounds, Jr. escorted Washington back to his cell after a shower. ECF No. 22-3. After Washington's cell door was secured, he was ordered to place his arms thorough the door's security slot so that his handcuffs could be removed. *Id.* He did so and his right cuff was removed without incident. Before his left cuff could be removed, however, Washington pulled both arms back inside his cell. Rounds, Jr. decided to advise the Officer-in-Charge ("OIC") of

---

[2] The court references the electronic docketing pagination.

the situation and pushed the slot shut so he could do so. Rounds, Jr. claims that as he closed the slot, Washington stuck his left hand through the slot and the slot accidentally closed on his left arm. *Id.* The infraction notice indicates that the medical department was contacted to treat Washington, and Rounds, Jr. escorted Washington to the medical department where he was treated for an abrasion to his arm. ECF No. 22-3.

Rounds, Jr. affirms that he was not disciplined following the July 27, 2015 incident and the Internal Investigative Division ("IID") of the Department of Public Safety and Correctional Services ("DPSCS") did not investigate Rounds, Jr. following the event. According to the medical record provided by defendants, Washington's abrasion was cleaned, bacitracin was applied and a bandage was placed on the wound. ECF No. 22-6. He was provided with additional bacitracin and bandages. Washington was also instructed to place a sick-call slip if he had any further problems. He voiced no further complaints and was returned to his cell. One week later, on August 4, 2015, Washington was examined by Nurse Moyer and complained of pain to his left thumb, which he claimed was injured when "his arm was caught in the slot." *Id.* Washington complained that he could not move his thumb without pain.

### Incident of October 12, 2015.

According to the IID report, at 8:52 p.m. IID was notified of an incident that had occurred earlier that same day involving Washington. ECF No. 22-7. IID reported that Correctional Officers Durst, Rounds, Jr., Rounds, Sr., Peters and Mallow were accused of assaulting Washington. The IID conducted an interview of the five officers and Washington. Durst reported that Washington had stuck his arm in the cell door's security slot upon his return to the cell. When questioned if there was a problem, Washington indicated that he wanted to be moved to a different cell. He was informed that he would have to submit the request to the tier

officer. Durst advised Washington that his request may not be granted because Washington was known to be a compulsive slot holder. *Id.*

Correctional Officer Murray, the tier officer, arrived at the cell and informed Washington that his request for a cell change would not be satisfied that day. Durst asserted that Washington then lunged at him, and Murray sprayed Washington with a chemical agent. Washington was then escorted out of his cell by Durst and Peters. Durst claimed that medical personnel evaluated Washington and he was strip searched in the property room's strip cage. Following the strip search, Washington was taken to a decontamination shower where the chemical agent was rinsed off before he was further escorted without further incident to a contingency cell. ECF No. 22-7. Murray asserts that Durst never gave him an order to spray Washington with a chemical agent. He maintains that he spontaneously sprayed Washington because he was attempting to grab Durst. ECF No. 22-4.

Durst claims that neither he nor any other officer assaulted Washington and he did not observe any injuries or bleeding on Washington at any time that day. ECF No. 22-2. Murray wrote an incident and infraction report concerning the October 12, 2015 incident. He reported that Washington had his arm in the cell door slot and was refusing to allow the slot door to be closed. He refused to comply with a direct order to remove his arm from the slot, but instead reached out of the slot in an attempt to grab Durst. Murray applied a short burst of a chemical agent to hinder Washington's action. Murray asserts that he did not physically touch or assault plaintiff on October 12, 2015, nor did he observe any officer or correctional employee assault Washington. He maintains that the only use of force he employed was to use the chemical agent in response to Washington's non-compliant behavior. ECF No. 22-4

Washington was examined by Nurse Claycomb for his exposure to pepper spray on the morning of October 12, 2015. She found his breathing to be unlabored and noted that he was in no acute distress. He voiced no other injuries. ECF No. 22-6. Defendants argue that photographs taken of Washington show that he had no injuries, with the exception of a "slight redness to his left shoulder." ECF No. 22-7. Washington returned to the medical department later that same day. He had four lacerations on his face; one was located above his right eye, two were found above his left eye, and the fourth laceration was located on his left eyelid. Washington complained of pain on his right side when taking breaths, but no bruising, swelling, or redness was observed. ECF No. 22-6. Photographs taken later that day show his facial lacerations. ECF No. 22-7.

Rounds, Jr. reported to Washington's cell after Durst had radioed for assistance. Upon his arrival, Rounds, Jr. saw that Washington had been sprayed with a chemical agent. ECF No. 22-3. He followed behind Washington as he was being escorted first to the medical unit, then to the strip cage, to the showers, and to a cell. Rounds, Jr. maintains he did not assault Washington or witness any other officer assault Washington. He contends that as of 2:00 p.m. on October 12, 2015, and thereafter that day, he observed that Washington did not appear to be injured. *Id.*

IID Investigator Sargent Chris Burton reviewed the video surveillance footage of the October 12, 2015 incident and noted that there was a brief struggle at Washington's cell door. He was unable to see what had exactly occurred, but was able to observe a chemical agent being sprayed into Washington's cell. ECF No. 22-7. Burton noted photographs of Washington that showed lacerations above both his eyes, but no visible injuries to the side or rear of his head. He concluded that those injuries were inconsistent with Washington's description of the alleged assault. Officer Rounds, Sr. affirms that Washington had previously attempted to injure himself

with staples. ECF No. 22-5. Burton concluded that there was insufficient evidence to advance the IID criminal investigation to file charges and prosecute officers. ECF No. 22-7. It was recommended that the case be closed with no charges to be filed.

Washington was charged with several rule violations including assault and battery on staff, interfering with or resisting the performance of staff duties, and disobeying an order. ECF No. 22-9. He was found guilty of violating all three rules at his adjustment hearing and did not appeal the findings to the Warden. *Id.*

Defendants all deny subsequently threatening Washington in any manner, placing foreign substances in his meals, or denying him a recreational or institutional pass in retaliation for his claims against them. They further deny witnessing any officer threaten Washington or put a foreign substance in his food. ECF No. 22-2, 22-3, 22-4, & 22-5.

Defendants argue that they have never interfered with Washington's attempts to grieve his claims through the administrative remedy procedure ("ARP") process. They maintain that there is a record of Washington filing an ARP regarding the October 12, 2015 incident and the ARP was procedurally dismissed as the matter had been referred to the IID. ECF No. 22-9. Defendants argue that Washington did not file any subsequent ARPs regarding his claims of retaliation, with the exception of his ARP that he was provided an improper meal on October 13, 2015. They maintain that since July 1, 2015, Washington did file two ARP Appeals. One appeal concerned sanctions imposed on him pending an adjustment hearing concerning the July 27, 2015 incident. ECF No. 22-10. The second ARP appeal concerned a use of force incident that occurred on May 16, 2016. *Id.* The Executive Director of the Inmate Grievance Office ("IGO") maintains that he never received a grievance from Washington. ECF No. 22-12.

7

In his verified opposition Washington alleges that defendants assaulted him on July 27, 2015, by maliciously closing the food slot on his hand, resulting in his hand being fractured. He contends that this injury was addressed by a specialist on a later date when he was evaluated for an injury to his thumb caused by the slamming of the door cell slot. Washington asserts that he received an x-ray which showed a left wrist fracture. He claims that he received medical supplies, a support brace, and physical therapy for the injury. Washington seemingly asserts that he was found not guilty of the cited rule infractions. ECF No. 24.

Washington further asserts that on October 12, 2015, he was sprayed with a full can of pepper spray and disputes the allegation that the chemical agent was employed solely to thwart his attempt to assault Durst. He maintains that his lunging at Durst "never happened." *Id*. Washington reiterates the claims made in his complaint, contending that subsequent to the use of pepper spray, the officers engaged in continuing assaultive behavior involving choking him, punching him about the lower and upper body, and ramming his head into the shower wall. Washington maintains that defendants refused to get him medical treatment and he was held in a contingency cell for several hours, bleeding from the head, until a later shift when he was sent to the medical department and received stitches above both eyes. *Id*.

Washington argues that the evidence provided to the IID was never investigated and asserts that defendants denied him meals, threatened to kill him, and placed foreign objects in his lunch meals as a result of his filing assault complaints. He further argues that there is no sufficient evidence to prove that he is a habitual slot holder or that he attempted to injure himself using staples. Washington disputes defendants' affirmations regarding the need for force, the amount of force employed against him, and the nature of the injuries he sustained. *Id*.

Moreover, Washington argues that defendants interfered with his attempts to access the ARP process in that they tampered with his ARPs and otherwise threw away his grievances. He maintains that he attempted to follow all policies and procedures involving the ARP exhaustion process and voices his belief that because his ARP was procedurally dismissed because of the IID investigation, there were no further steps to take with the ARP process. ECF No. 24.

Defendants have replied to Washington's opposition, claiming that he has not demonstrated that the incident of July 27, 2015, was anything more than an accidental closing of the door cell slot on his hand, when Washington got his hand stuck in the cell door slot. ECF No. 28. They further argue that the medical documents provided by Washington only show that he had a left wrist fracture that was age indeterminate. Thus, they assert that Washington could have incurred his left wrist fracture on any date. *Id.*

## Discussion

Washington's claims regarding these Eighth Amendment violations are subject to the administrative exhaustion requirement of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Under the PLRA, prisoners must exhaust their administrative remedies before filing claims under § 1983. *See* 42 U.S.C. § 1997e(h) ("[T]he term 'prisoner' means any person...detained in any facility who is accused of...violations of criminal law...."). Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell,* 478 F.3d 1223, 1225 (10th Cir. 2007).

Washington was required to exhaust his administrative remedies prior to filing this lawsuit. He claims that his grievances were tampered with and destroyed and that he took all necessary steps to comply with exhaustion requirements. Prison officials may not take unfair advantage of the exhaustion requirement and a remedy becomes "unavailable" if prison employees do not respond to a properly filed grievance, or if they otherwise act to prevent a prisoner from exhausting his administrative remedies. *See Moore v. Bennett*, 517 F.3d 717, 725 (4th Cir. 2008). Thus, a court may excuse a prisoner's failure to exhaust an administrative remedy if a prisoner "through no fault of his own, was prevented from availing himself of" the remedy. *Id.* The burden of showing that administrative remedies were unavailable lies with the plaintiff. *See, e.g., Graham v. Gentry*, 413 F. Appx. 660, 663 (4th Cir. 2011) ("[I]n order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure.") (citing *Moore*, 517 F.3d at 725).

To be sure, if prison officials impede a prisoner's attempts to exhaust by denying that inmate the proper forms, by failing to educate the inmate on the grievance process, or by failing to respond to a proper grievance, a prisoner may be excused from exhaustion requirements. *See Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001). Prison officials may not take unfair advantage of the exhaustion requirement, however, and a remedy becomes "unavailable" if prison employees do not respond to a properly filed grievance, or if they otherwise act to prevent a prisoner from exhausting his administrative remedies. *See Moore*, 517 F. 3d at 725; *see also* Gary Proctor, *Ngo Excuses: Proving, Rebutting, and Excusing Failure to Exhaust Administrative Remedies in Prisoner Suits after Woodford v. Ngo and Jones v. Bock*, 31 Hamline L.Rev.471, 487–489 (2008).

Exhaustion is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856-58 (2016); *Jones v. Bock*, 549 U.S. 199, 219 (2007). The purpose of exhaustion is to: 1) allow a prison to address complaints about the program it administers before being subjected to suit; 2) reduce litigation to the extent complaints are satisfactorily resolved; and 3) prepare a useful record in the event of litigation. *Jones*, 549 U.S. at 219. An inmate's failure to exhaust administrative remedies is an affirmative defense; Defendants bear the burden of proving that Plaintiff had remedies available to him of which he failed to take advantage. *Jones*, 549 U.S. at 211–12, 216; *Moore*, 517 F.3d at 725.

The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

In *Ross*, the Supreme Court identified three kinds of circumstances in which an administrative remedy is unavailable. First, "an administrative procedure is unavailable when despite what regulations or guidance materials may promise it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no

11

ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[3] *Id.* at 1860.

In light of factual information presented to the court, there is some question as to whether Washington's attempts to file grievances were impeded by prison personnel. The court cannot say on the record before it that Washington did not attempt to exhaust "available" administrative remedies. This court is familiar with the Division of Correction's practice to decline an investigation for an ARP where one is already pending before the IID.[4] Thus, the court

---

[3] In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure ("ARP") process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction.

If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office. *See* C.S. §§ 10-206, 10-210; COMAR 12 07.01.03; COMAR 12.07.01.05B. *See also Division of Correction Directive* 185-002, § VI.NI.

Complaints are reviewed preliminarily by the IGO. *See* Md. Corr. Servs., Code Ann. § 10-207; COMAR 12.07.01.06A. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Md. Corr. Servs., Code Ann. § 10-207(b)(1); see COMAR 12.07.01.07B. The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* Md. Cts. & Jud. Proc, Code Ann. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. Md. Corr. Servs., Code Ann. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* Md. Corr. Servs., Code Ann.. § 10-209(b)-(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* Md. Corr. Servs., Code Ann.. § 10-210. But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

[4] Under Division of Correction Directive 185-003.IV.N.4., the Warden or

concludes that the exhaustion requirement regarding the alleged excessive use of force is satisfied where, as here, the administrative procedure may be unavailable. *See generally Lynch v. Keionen et al.*, Civil Action No. GLR–13–998 (D. Md.), ECF No. 27 at 8; *Bogues v. McAlpine, et al.*, Civil Action No. CCB–11–463 (D. Md.), ECF No. 23, Ex. 4 at 23; *Oliver v. Harbough, et al.*, Civil Action No. ELH–11–996 (D. Md.), ECF No. 31 at 7–8. In my view, Washington's complaint is not subject to dismissal for a failure to exhaust administrative remedies. As such, the court will consider the merits of his claims.

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley v. Albers*, 475 U. S. 312, 321 (1986).

The absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34, 36-39 (2010). It is the nature of force used by the correctional officer, rather than the extent of the prison inmate's injury, that is the relevant inquiry in an Eighth Amendment claim. *See Hill v. Crum*, 727 F.3d 312, 320-321 (4th Cir. 2013). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Wilkins,*

---

institutional coordinator shall issue a final dismissal of a request for procedural reasons when it has been determined that the basis of the complaint is the same basis of an investigation under the authority of the Internal Investigative Unit ("IIU").

13

559 U.S. at 38. Not every malevolent touch by a prison guard, however, gives rise to a federal cause of action for excessive force in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. *Id.* at 37.

Viewing the facts in a light most favorable to Washington, he has been challenged to show that correctional officers maliciously applied force. There is plainly a material dispute as to whether Washington was interfering with and/or threatening correctional officers on July 27, 2015, and October 12, 2015. Thus, the factual allegations regarding the need for force, the extent of force used, and what injuries were sustained by Washington cannot be resolved on the motions.

Where, as here, there are factual disputes that are relevant and necessary in the determination of the outcome of the suit, summary judgment is precluded. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Plainly, there are genuine disputes of material fact concerning the events. The parties factually disagree as to the precise extent of force subsequently used and the need for that force.

It is not the role of the court on summary judgment to determine the truth of the matter or to make a credibility determination. The court is mindful that it has only been provided a minimal medical record and that Washington has submitted medical records entered several days after the July 27, 2015 incident which show a left wrist fracture. Further, the medical record shows Washington sustained injuries to his face contemporaneous with the October 12, 2015 incident. This court cannot, on the record before it, make an assessment as to whether the force was maliciously applied or reasonably used to subdue Washington based upon the facts he has presented.

For the aforementioned reasons, defendants' motion, construed as a motion for summary judgment, shall be DENIED. The complaint shall proceed.[5] Washington shall be granted an additional period of time to seek the appointment of counsel. A separate Order follows.

Date: November 5, 2016

_____
J. Frederick Motz
United States District Judge

---

[5] Insofar as Washington claims that he was subject to retaliation for filing complaints against the correctional officers in that he was threatened, denied meals and recreation and institutional passes, and had foreign objects placed in his lunch meals, his claims of retaliation shall be dismissed without prejudice. He provides no specifics regarding when these alleged incidents occurred or which of the defendants took such retaliatory action.